IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GREGORY R. REEN,                )
                                )
        Plaintiff,               )
                                )
    vs.                         ) Civil Action No. 08-1175
                                )
COMMISSIONER OF SOCIAL           )
SECURITY,                        )
                                )
        Defendant.               )

**MEMORANDUM OPINION**

## I. INTRODUCTION

Plaintiff, Gregory R. Reen, seeks judicial review of a decision of Defendant, Commissioner of Social Security ("the Commissioner"), denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-433 and §§ 1381-1383f. Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's motion for summary judgment will be denied, and the Commissioner's cross-motion for summary judgment will be granted.

## II. BACKGROUND

Plaintiff filed applications for DIB and SSI on January 29, 2004, alleging disability since December 1, 2003. (R. 33-37). Following the denial of Plaintiff's applications for DIB and SSI,

1

he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 24-25). At the hearing, which was held on July 27, 2005, Plaintiff, who was represented by counsel, his father and a vocational expert testified. (R. 138-67).

On January 5, 2006, following counsel's submission of additional evidence, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI based on his finding that Plaintiff had engaged in substantial gainful activity through June 25, 2005, when he voluntarily quit his job as a delicatessen clerk. (R. 13-15). Plaintiff requested review of the ALJ's decision. (R. 9). However, the request was denied by the Appeals Council on February 26, 2008. (R. 4-7). This appeal followed.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806

F.2d 1185, 1190-91 (3d Cir.1986).

### III. FACTS

At the time of his birth on April 16, 1971, Plaintiff suffered from meconium aspiration syndrome which resulted in his placement in the hospital's intensive care unit for two weeks.[1] Subsequently, Plaintiff's developmental progress in "a lot" of areas was very slow. Intellectual testing by Martin Meyer, Ph.D., a licensed psychologist, during a psychological evaluation in December 1991, when Plaintiff was 20 years old, showed a Verbal IQ of 84, a Performance IQ of 88 and a Full Scale IQ of 85, establishing a low average range of intelligence.[2] (R. 113, 142-43, 152).

---

[1] Meconium is the first feces of a newborn. Meconium aspiration syndrome is a serious condition in which a newborn breathes a mixture of meconium and amniotic fluid into the lungs around the time of delivery. The mixture can enter the lungs and partially or completely block the infant's airways. Lack of oxygen in the uterus or from complications of meconium aspiration may lead to brain damage. The outcome depends on the degree of brain damage. Meconium aspiration syndrome is a leading cause of severe illness and death in newborns. www.nlm.nih.gov/medlineplus/encyc (last visited 1/23/2009).

[2] Dr. Meyer performed another clinical psychological evaluation of Plaintiff on July 13, 2005, two weeks before the ALJ hearing. Plaintiff's intellectual testing on that date showed a Verbal IQ of 82, a Performance IQ of 84 and a Full Scale IQ of 81, resulting in a diagnosis of Borderline Intellectual Functioning. (R. 134-37). Borderline Intellectual Functioning is a categorization of intelligence wherein a person has below average cognitive ability (an IQ of 71-85), but the deficit is not as severe as mental retardation (70 or below). *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV*. Washington, DC: American Psychiatric Association 2000.

3

With respect to education, Plaintiff graduated from high school. However, beginning in elementary school, Plaintiff attended special education classes due to his classification as "Educable Mentally Retarded." After high school, Plaintiff was referred to the Office of Vocational Rehabilitation, a division of the Association for Retarded Citizens in Butler County, Pennsylvania, for an evaluation of his ability to work. Plaintiff was then referred to a program called Career Opportunities for the Disabled ("COD"), which places individuals with employers and provides job coaches to assist the individuals in their new employment. Federal and state tax credits are available to employers who hire employees through COD. (R. 53, 102-07, 142-43).

Plaintiff was placed with several employers by COD. The majority of the jobs were low paying part-time jobs. From March 3, 2003 to June 17, 2005, Plaintiff was employed as a delicatessen clerk by Friedman's Supermarket.[3] Plaintiff left his employment with Friedman's Supermarket on June 17, 2005 to look for a higher paying job and due to a "pretty bad personality conflict" with another employee. Although COD had placed Plaintiff in his job with Friedman's Supermarket, a COD job coach did not provide any assistance to Plaintiff during this

---

[3] Prior to this employment, Plaintiff held jobs as a dishwasher/busboy, laborer and assembler. (R. 155-56).

4

employment due to union regulations. Also, there is no evidence that Friedman's Supermarket received Federal and state tax credits as a result of Plaintiff's employment. (R. 96, 102, 144, 150, 153-54).

The evidence in Plaintiff's administrative file includes the following: (1) records of the Butler Area School District for the 1988-89 school year which indicate that Plaintiff was classified as "Educable Mentally Retarded" (R. 107-09); (2) a report of a neuropsychological assessment of Plaintiff by Martin Meyer, Ph.D., dated December 18, 1991 (R. 112-17); (3) a letter to COD from the Office of Vocational Rehabilitation dated March 15, 1996, regarding Plaintiff's referral to COD's job coaching program (R. 110-11); (4) Disability Reports completed by Plaintiff or on his behalf on February 9, 2003 and February 20, 2004 (R. 46-55, 67-73); (5) a Daily Activities Questionnaire completed by Plaintiff on February 23, 2004 (R. 82-86); (6) Plaintiff's earnings records for 2004 and 2005 (R. 40-41, 43-45); (7) a report of a clinical psychological evaluation of Plaintiff by Martin Meyer, Ph.D., dated July 13, 2005 (R. 134-37); and (8) a letter with attachments from the Program Manager of COD dated August 29, 2005 (R. 102-05).

**IV. ALJ'S DECISION**

When presented with a claim for disability benefits, an ALJ

must follow a sequential evaluation process,[4] which was described by the United States Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\* \* \*

> Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

\* \* \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other

---

[4] See 20 C.F.R. § 404.1520(a)(4).

6

jobs existing in significant numbers in the national economy. Ramirez v. Barnhart, 372 F.3d 546, 550-51 (3d Cir.2004). In the present case, the ALJ's analysis proceeded no further than step one based on his finding that Plaintiff was engaged in substantial gainful activity until June 25, 2005, when he voluntarily quit his job at Friedman's Supermarket. (R. 15).

## V. ANALYSIS

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

Substantial gainful activity is defined in the Social Security Regulations as follows:

### § 404.1572 What we mean by substantial gainful activity

Substantial gainful activity is work activity that is both substantial and gainful:

7

> (a) *Substantial work activity.* Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
>
> (b) *Gainful work activity.* Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.
>
> (c) *Some other activities.* Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activities."

20 C.F.R. §§ 404.1572 and 416.972.

In evaluating a claimant's work activity for purposes of determining substantial gainful activity, the earnings derived by the claimant from the work activity is the primary consideration. If a claimant's earnings exceed guidelines set forth in the Social Security Regulations, a presumption arises that the claimant is engaged in substantial gainful activity. However, a claimant may rebut the presumption by showing that (a) he or she meets the earnings guidelines in the Social Security Regulations only because the earnings are not directly related to his or her productivity, the earnings include a subsidy and the true value of his or her work is less than the actual earnings or the earnings include impairment-related work expenses, or (b) maintaining the employment is dependent upon the claimant receiving special assistance not required by other employees performing similar work. See 20 C.F.R. §§ 404.1574 and 416.974.

8

Under the earnings guidelines in the Social Security Regulations, earnings averaging more than $810 per month in 2004 and $830 per month in 2005 constitute substantial gainful activity. See www.ssa.gov/OACT/COLA/sga.html. Based on Plaintiff's earnings records which show that he earned, on average, $912 per month in 2004 and $931 per month in 2005,[5] as well as a lack of evidence to show that Plaintiff's earnings were subsidized in any manner and the fact that the termination of Plaintiff's employment with Friedman's Supermarket in June 2005 was voluntary and unrelated to his Borderline Intellectual Functioning,[6] the ALJ concluded that Plaintiff was engaged in substantial gainful activity through June 2005. Thus, Plaintiff's claims for DIB and SSI were denied.[7]

---

[5]Plaintiff does not dispute the ALJ's calculation of his average monthly earnings for 2004 and 2005 based on his earnings records. (Docket No. 8, p. 12).

[6]With respect to the ALJ's finding that the termination of Plaintiff's employment with Friedman's Supermarket was not related to his mental impairment, Plaintiff asserts that his "limited intellectual ability in this case, clearly, impacted his ability to deal with the female employee with whom there were problems," and that because he "was unable to deal with it due to his limited intellectual capacity, he quit the job." (Docket No. 8, p. 13). However, Plaintiff had the burden of proving this assertion and the Court's careful review of the administrative record reveals no evidence to support the assertion. In addition, Plaintiff fails to address his father's testimony that one of the reasons he quit the job with Friedman's Supermarket was to look for a higher paying job.

[7]With respect to the ALJ's finding that Plaintiff was engaged in substantial gainful activity through June 2005, Plaintiff asserts the following:

9

Plaintiff's initial argument in support of summary judgment is based on COD's provision of a job coach in connection with the employment he obtained through that program. Specifically, relying on the decisions in Chicager v. Califano, 574 F.2d 161 (3d Cir.1978) and Nazzaro v. Callahan, 978 F.Supp. 452 (W.D.N.Y.1997), Plaintiff argues that the ALJ erred by failing to consider whether the assistance provided by the COD job coach in connection with his employment by Friedman's Supermarket rebutted the presumption that he was engaged in substantial gainful activity in 2004 and 2005 based on his average monthly earnings during those years. After consideration, the Court finds this argument unpersuasive.

In Chicager, a claimant sought disability benefits under the

---

"Shortly after the initial applications for Disability Insurance Benefits and Supplemental Security Income were taken by the local Butler County District Social Security Office, an employee from that office reviewed the earnings of Plaintiff at that time and determined that beginning December 1, 2003, Plaintiff's work was not considered substantial gainful activity." A review of the document to which Plaintiff is referring does not support this assertion. The Social Security Administration employee's note states: "Per Employer Claimant did SGA ... from 03/03 - 11/03. SGA curtailed 12/03." Clearly, the notation was not based on the employee's own review of Plaintiff's earnings records and independent determination. Rather, it was based on information apparently provided by Plaintiff's employer. In any event, Plaintiff does not challenge the accuracy of his earnings records for 2004 and 2005, and the earnings reflected in those records meet the earning guidelines in the Social Security Regulations for those years. Thus, the Social Security Administration employee's notation is irrelevant.

10

Social Security Act due to a physical impairment. The ALJ found that the claimant's earnings as a truck dispatcher in 1996, 1997 and 1998 established his ability to engage in substantial gainful activity under the earnings guidelines in the Social Security Regulations, and, therefore, the ALJ denied the claimant's applications for Social Security disability benefits. Plaintiff appealed the ALJ's decision; however, the decision was affirmed by the district court. On further appeal, the Court of Appeals for the Third Circuit reversed the ALJ's decision, holding that the presumption of an ability to engage in substantial gainful activity arising from the claimant's earnings as a truck dispatcher in 1996, 1997 and 1998 was overcome by the evidence in the case, including evidence of unusual assistance by the claimant's co-workers which enabled him to keep the job.[8]

Similarly, in Nazzaro, a claimant sought judicial review of a decision of an ALJ denying his application for Social Security disability benefits based on a severe learning disability. The

---

[8] In Chicager, the evidence also showed that the employer was willing to tolerate the claimant's frequent absences from work due to his physical impairment, and that the assistance required by the claimant extended to such simple tasks as the use of the telephone to perform the job. 547 F.2d at 162-64. In contrast, Plaintiff completed a Daily Activities Question on February 23, 2004 (apparently before the personality conflict with a coworker at Friedman's Supermarket arose) in which he reported that (a) he usually reported to work on time, (b) he had good attendance, (c) he was usually able to keep up with his work, (d) he was able to concentrate on his work for extended periods of time, (e) he did not have trouble getting along with supervisors or coworkers, and (f) he was able to accept changes at work that affected his job. (R. 85-86).

11

evidence showed that since his graduation from high school, the claimant had held three regular jobs which were obtained through an employment program supported by the Western New York Association for the Learning Disabled ("WNYALD"). WNYALD provided the claimant with a job coach who assisted him in adapting to his jobs, including learning new job duties and safety aspects of the job. The job coach also acted as an intermediary between the claimant and his boss whenever the claimant experienced coping difficulties in the work setting. In the district court, the claimant argued, among other things, that the ALJ erred by failing to consider whether the special employment conditions created by the job coach services provided to him by WNYALD established that he was not engaged in substantial gainful activity, despite earnings that exceeded the earnings guidelines in the Social Security Regulations. Noting that work performed under special conditions such as with more assistance or supervision than is usually given other employees engaged in similar work may, regardless of the level of earnings, indicate that the employee is not working at the substantial gainful activity level, the district court agreed with the claimant that the ALJ's decision was based on legal error and the case was remanded for consideration of the special circumstances which enabled the claimant to maintain his employment in a

supermarket bakery.[9]

In the present case, Plaintiff testified at the hearing before the ALJ that a job coach was provided by COD in connection with his employment by Friedman's Supermarket, but no testimony was elicited from Plaintiff regarding the nature and extent of the assistance provided by the job coach. (R. 158). If the administrative record lacked any other evidence regarding the assistance provided to Plaintiff by the COD job coach, a remand of the case for further development of the record would be necessary. However, following the hearing and prior to the issuance of the ALJ's decision, Plaintiff's counsel submitted a letter to the ALJ dated August 29, 2005 from COD's Program Manager which specifically states that although a job coach assisted Plaintiff in obtaining the employment with Friedman's Supermarket, the employer would not permit the job coach to

---

[9]In Nazzaro, a letter from WNYALD was submitted by the claimant to advise the Social Security Administration of the severity of his learning disability and the nature and extent of the services provided by his job coach. The letter stated that the claimant required "extensive reinforcement from the job coach to assist him in appropriate interaction with coworkers and supervisors, and learning his job duties." The letter also stated that it was anticipated the claimant "would require on-going support services from the program indefinitely," and that "without such support Nazzaro would not be currently employed." 978 F.Supp. at 456. In contrast, in the present case, Plaintiff's "case was successfully closed from the COD program on June 25, 2003," two years before he voluntarily left his employment with Friedman's Supermarket. (R. 102).

assist Plaintiff on the job due to union regulations.[10] (R. 102). Thus, unlike Chicager and Nazzaro, the evidence does not support a finding that Plaintiff's ability to maintain his employment with Friedman's Supermarket was due to special assistance by a job coach or any other special accommodations by the employer. Accordingly, the ALJ did not err by failing to consider the assistance provided by the COD job coach in determining whether Plaintiff's employment with Friedman's Supermarket constituted substantial gainful activity based on his 2004 and 2005 earnings.

Plaintiff also argues in support of his motion for summary judgment that the ALJ erred in finding that his earnings during 2004 and 2005 constituted substantial gainful activity because the ALJ failed to take into consideration the Federal and state tax credits that Friedman's Supermarket received for employing him. However, despite his burden of proof to show that he is unable to engage in substantial gainful activity due to Borderline Intellectual Functioning, Plaintiff failed to submit any evidence to support his claims that Friedman's Supermarket received significant tax credits as a result of his employment and that Friedman's Supermarket would not have employed him in the absence of the tax credits.[11] Under the circumstances, this

---

[10] In his brief in support of summary judgment, Plaintiff fails to mention this statement in the letter from COD's Program Manager. (Docket No. 8).

[11] In this connection, the letter of COD's Program Manager dated August 29, 2005 states: "As far as a tax credit for the

14

argument also is unavailing.

**VI. CONCLUSION**

Based on the Court's determination that the ALJ did not err in finding that Plaintiff is able to perform substantial gainful activity despite Borderline Intellectual Functioning, judgment will be entered in favor of the Commissioner as a matter of law.

*William L. Standish*
William L. Standish
United States District Judge

Date: January 27, 2009

---

employer, I am not sure whether Friedman's took advantage of the tax credit. Our records to (sic) not show that the job coach informed the employer of the tax credit or that the employer asked about the tax credit. Sometimes, the employers already know about the tax credit and do not ask for the information or forms...." (R. 102).